IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

WESLEY H. RUBLE                                                                       PLAINTIFF

vs.                                       Civil No. 5:20-cv-05224

KILOLO KIJAKAZI, Acting Commissioner,[1]
Social Security Administration                                        DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Wesley H. Ruble, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claims for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 423(d)(1)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.**     **Procedural Background:**

Plaintiff filed his application for DIB on August 3, 2019, alleging an onset date of November 15, 2018, due to chronic post-traumatic stress disorder, depressive disorder, and traumatic brain injury. (Tr. 10, 78, 92). Plaintiff was 30 years old on the alleged onset date. (Tr. 21). He had past relevant work ("PRW") as an electronic technician/customer service representative, radar repairer, data control specialist, and construction worker I. (*Id.*).

The Commissioner denied his application, both initially and upon reconsideration. (Tr. 103-105, 109-110). At Plaintiff's request (Tr. 111-118), an Administrative Law Judge ("ALJ")

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

held an administrative hearing on August 3, 2020, via telephone. (Tr. 28-76). Plaintiff was present and represented by counsel.

On August 20, 2020, the ALJ found Plaintiff had the following severe impairments: post-traumatic stress syndrome (PTSD) and depression. (Tr. 13). The ALJ concluded that Plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14, Finding 4). The ALJ determined Plaintiff retained the RFC to do the following:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to simple, routine, and repetitive task with social interaction that is incidental to work performed; due to PTSD, office level noise 3, and due to distractibility, no moving mechanical parts. (Tr. 16, Finding 5).

With the assistance of a vocational expert ("VE"), the ALJ found Plaintiff could perform work as an industrial cleaner, linen checker, housekeeping cleaner, and office helper. (Tr. 22). She concluded Plaintiff had not been under a disability as defined by the Act from November 15, 2018, through the date of the ALJ's decision, August 20, 2020. (Tr. 22, Finding 11).

The Appeals Council denied Plaintiff's request for review on October 21, 2020. (Tr. 1-9). This matter is before the undersigned for report and recommendation. Both parties have filed appeal briefs (ECF Nos. 14, 15), and the case is ready for decision.

II.     **Applicable Law:**

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support

it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months. The disability determination process is not an adversarial process; instead, the Commissioner's duty exists alongside the claimant's burden to prove his case. *See Noerper v. Saul*, 964 F.3d 738 (8th Cir. 2020).

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy

3

given his age, education, and experience. 20 C.F.R. § 404.1520(a)(4). The fact finder only considers Plaintiff's age, education, and work experience in light of his residual functional capacity if the final stage of the analysis is reached. 20 C.F.R. § 404.1520(a)(4)(v).

### III. Evidence Presented:

This Court's review of the medical record evidence reveals the following:

On May 9, 2018, Plaintiff was seen by his treating psychiatrist, Michelle R. Hausheer, M.D. (Tr. 619). Dr. Hausheer opined Plaintiff was having trouble getting to sleep and that his sleep improves in waves, but that Trazodone was helping keep him asleep. During Plaintiff's mental status exam, Plaintiff maintained good eye contact. He presented with a beard and uncombed hair, but his clothes were clean and there was no psychomotor retardation. Plaintiff exhibited a normal amount of energy according to the movement Dr. Hausheer observed while speaking with Plaintiff. While Plaintiff's mental status exam manifested some normal findings, both his judgment and insight were abnormal. Dr. Hausheer noted that Plaintiff is hypervigilant about people walking by his apartment window or by doors closing in the complex. Dr. Hausheer continued Venlafaxine XR 300 mg (morning) and Prazosin 4 mg (bedtime), and increased Plaintiff's Mirtazapine to 30 mg (bedtime). (*Id.*).

Plaintiff was seen by Dr. Hausheer on July 10, 2018, for a follow up appointment. (Tr. 597-604). His mental status exam was mostly normal and Dr. Hausheer continued Venlafaxine XR 300 mg and Prazosin 4 mg but discontinued Mirtazapine. (Tr. 600-601, 604).

On September 24, 2018, Plaintiff saw Dr. Hausheer regarding his medications. (Tr. 549-554). Plaintiff appeared with a longer beard and longer hair that was unwashed but combed. (Tr. 553). Plaintiff was cooperative with no behavioral signs of hallucinations, mannerisms, or

grimacing; however, he presented psychomotor retardation.[2] His mood was dysthymic[3] and Dr. Hausheer noted Plaintiff "almost burst into tears in my office." Dr. Hausheer noted Plaintiff was no longer stuttering but was irritable and angrier, expressing feelings of aggression since being off the Venlafaxine. (Tr. 554). Dr. Hausheer concluded Plaintiff was more depressed without Venlafaxine, noting he had resumed neglecting hygiene. While not suicidal, Plaintiff was assessed to be experiencing enough anger to hurt others. Plaintiff was assessed for a traumatic brain injury, and Dr. Hausheer switched Plaintiff to Duloxetine 60 mg noting that although Venlafaxine helped more than other medications, it did not help Plaintiff quite enough. Dr. Hausheer continued Prazosin 4 mg and advised Plaintiff not to consume alcohol. (*Id.*).

Plaintiff returned to Dr. Hausheer on December 18, 2018, with complaints of depression, fidgeting and being "wound up." (Tr. 513-518). Specifically, Plaintiff reported when more people were in his workspace, the noise was overwhelming, and it became hard for him to focus or maintain concentration. Dr. Hausheer found Plaintiff irritable but not as severe, noting he was not as prone to fits of rage at home as when he was on Duloxetine. Plaintiff reported fleeting thoughts of suicide but with no intent. Dr. Hausheer noted a lack of hygiene and reported drinking once a month. Plaintiff's mental status examination was mostly normal; however, his mood and affect were dysthymic. (Tr. 516-517). Dr. Hausheer increased Plaintiff's Duloxetine to 90 mg because

---

[2] The term "psychomotor" refers to the connections made between mental and muscle functions. Psychomotor impairment occurs when there's a disruption with these connections. It affects the way you move, talk, and other regular activities. Psychomotor impairment is technically the opposite of psychomotor agitation, restless symptoms, such as skin picking or pacing around the room, that are caused by what may be described as mental tension. However, both psychomotor impairment and agitation may occur with the same underlying cause. *See* Psychomotor Retardation (Impairment), at https://www.healthline.com/health/psychomotor-retardation (last accessed Nov. 30, 2021).

[3] Persistent depressive disorder (formerly dysthymic disorder) is characterized by chronic low-level depression that is not as severe, but may be longer lasting than, major depressive disorder. *See* Persistent Depressive Disorder (Dysthymic Disorder), at https://www.nimh.nih.gov/health/statistics/persistent-depressive-disorder-dysthymic-disorder (last accessed Nov. 30, 2021).

it was not helping as much as Venlafaxine; she continued Prazosin 40 mg and advised Plaintiff to refrain from alcohol.

Approximately 90 days later, Plaintiff presented to Dr. Hausheer on March 27, 2019, with complaints of depression, anxiety, and irritability. (Tr. 498). Plaintiff admitted he left his apartment only once a week and described having a tick or movement of his head since the Duloxetine was increased. Plaintiff reported he was sleeping on his couch since someone moved into the apartment next door and he now felt uncomfortable at home. (Tr. 499). He reported no energy and no motivation, stating he doesn't do anything unless he must. Plaintiff's mood and affect were slightly dysthymic with fair judgment and insight. (Tr. 502). Plaintiff's lack of motivation and concerns about forgetting were prominent, and Dr. Hausheer decided to taper Plaintiff off Duloxetine and switch him back to Venlafaxine XR 225 mg. (Tr. 503). Plaintiff's Prazosin 4m was continued and Abilify 5 mg was added as an adjunct for depression. (*Id.*).

Plaintiff returned to Dr. Hausheer on May 22, 2019, for a follow up appointment. (Tr. 486-493). Plaintiff's mental status examination was normal; his depression had improved but his hypervigilance had worsened as he had neighbors in the apartments around him. (Tr. 492). Dr. Hausheer continued Plaintiff's medications and discussed prolonged exposure regarding Plaintiff's hypervigilance and his sensitivity to the stimulus of people being around him. (Tr. 492-493). Dr. Hausheer provided Plaintiff a URL address for the PTSD decision aid and opined that "[a]t this point it looks like he needs prolonged exposure." (Tr. 493).

Plaintiff next saw Dr. Hausheer on July 1, 2019. (Tr. 464-474). While Plaintiff's mental status exam was mostly normal, Dr. Hausheer diagnosed him with PTSD chronic (multiple traumas), depression (multiple causes including PTSD, exacerbation by alcohol at different times and low testosterone), alcohol use disorder (severe in early remission), and nicotine use disorder

(mild). (Tr. 473). Dr. Hausheer observed Plaintiff was not stuttering anymore, and that his depression was improved but that his hypervigilance had worsened. Consequently, Dr. Hausheer continued Venlafaxine XR 225 mg in the morning, increased Abilify 10 mg in the morning as an adjunct for depression, and continued Prazosin 4 mg at bedtime. (*Id*.).

On August 1, 2019, Jason Cates, LCSW, submitted a letter on behalf of Plaintiff, and stated that Plaintiff "admits to struggling with anger, verbal aggression and persistent homicidal ideation as a result of his conflict with his past co-workers." (Tr. 290). Mr. Cates references in his letter that Plaintiff's PTSD is related to his combat experiences and traumas in Iraq. According to Mr. Cates, Plaintiff reported worsening symptoms of anxiety, panic attacks, sleep disruption, poor concentration, and memory impairment. The letter further disclosed that Plaintiff struggles with chronic depressive symptoms exacerbated by feelings of helplessness in his inability to achieve meaningful/sustainable employment and endorses suicidal ideation. (*Id*.).

Plaintiff returned to Dr. Hausheer on August 22, 2019, and claimed Prazosin stopped his nightmares. (Tr. 303). Plaintiff exhibited less energy and less motivation, although, increasing Abilify had improved his mood and he stopped drinking two weeks earlier. Plaintiff had a mostly normal mental status examination; however, he manifested psychomotor retardation. (Tr. 305-306). Dr. Hausheer concluded Plaintiff's depression improved a little and his hypervigilance had not worsened further; nonetheless, she opined Plaintiff still has anhedonia (inability to feel pleasure). (Tr. 306). Dr. Hausheer continued Venlafaxine XR 225 mg in the morning, Prazosin 4 mg at bedtime, and increased Abilify to 20 mg in the morning as an adjunct to depression. (*Id*.).

On September 17, 2019, Dr. Kay Cogbill, M.D., a non-examining state agency consultant, completed Plaintiff's mental RFC assessment. (Tr. 84-86). After diagnosing depressive, bipolar, trauma, and stressor disorders, Dr. Cogbill found moderate limitations in the following areas:

ability to carry out detailed instructions; maintaining attention and concentration for extended periods; ability to sustain an ordinary routine without special supervision; ability to work in coordination with or in proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to ask simple questions or request assistance; accepting instructions and responding appropriately to criticism from supervisors; maintaining socially appropriate behavior adhering to basic standards of neatness and cleanliness. (Tr. 85-86). This assessment was affirmed at the reconsideration level by Dr. Steve Brown, M.D., on January 15, 2020. (Tr. 97-99).

On October 4, 2019, Plaintiff presented to Audiologist, Beth Muller, for a consultative Otologic Exam. (Tr. 734-735). She noted Plaintiff has a history of exposure to heavy equipment and gunfire from his time serving in the military in Iraq in 2008 and wears hearing aids. (Tr. 734). Ms. Muller opined that, due to Plaintiff's diminished hearing, he has trouble with clarity/speech understanding, particularly in environments background noise. Interestingly, Ms. Muller concluded both external ears appear within normal limits and according to Plaintiff's Otoscopic exam, both ears were within normal limits. (*Id*.).

Plaintiff returned to Dr. Hausheer on October 24, 2019. (Tr. 743). Plaintiff's depression improved a little, but he still has anhedonia and expressed thoughts of "what's the point" and middle of the night insomnia. Dr. Hausheer increased Venlafaxine XR to 300 mg in the morning, continued Prazosin 4 mg at bedtime, and Abilify 20 mg in the morning as an adjunct for depression. Plaintiff underwent a depression screen, scoring a six which indicated a positive depression scale for the past two weeks. (Tr. 746). Importantly, Plaintiff's suicide screening score was two, indicating a positive primary screen for risk of suicide. (*Id*.).

On January 24, 2020, suicide prevention coordinator Perry L. Payne, LCSW, called Plaintiff at the request of Mr. Cates. (Tr. 788). Plaintiff reported "he has been having increased SI [suicidal ideation] lately." (*Id.*). Specifically, Plaintiff stated he has been getting tired of dealing with everything – depression, post-traumatic stress syndrome, and people. Plaintiff was asked about using a safety plan and reported he has a couple of people to contact over the weekend and gave his guns to his stepfather to hold for him. Plaintiff also revealed he has been having problems with sleep, anxiety, and social isolation. Notably, months later, at the administrative hearing held on August 17, 2020, Plaintiff was asked if he ever thinks about "not being here anymore," and in response, Plaintiff replied, "I do." (Tr. 60).

On February 6, 2020, Robert Billingsley, M.D., completed a compensation and pension (C&P) exam PTSD questionnaire. (Tr. 782-787). Plaintiff's mood appeared anxious and depressed, and his affect was constricted. (Tr. 787). Dr. Billingsley observed there was no evidence of delusions or hallucinations; however, Plaintiff described significant difficulty with focus concentration and short-term memory due to his high levels of anxiety, hypervigilance, irritability, and intrusive memories. (*Id.*). Regarding the level of Plaintiff's occupation and social impairment in relation to all mental diagnoses, Dr. Billingsley opined Plaintiff suffers from a total occupational and social impairment. (Tr. 783). Dr. Billingsley further concluded Plaintiff continues to suffer from overwhelming, service-connected, combat related PTSD. (*Id.*). As a result of Plaintiff's symptoms of PTSD, according to Dr. Billingsley, Plaintiff described complete social isolation, and continued painful reexperiencing, avoidance withdrawal, and hyperarousal symptoms despite ongoing appropriate psychiatric care. (*Id.*).

Plaintiff returned to Dr. Hausheer on May 27, 2020, complaining of sleep issues. (Tr. 774-775). Plaintiff reported he couldn't fall asleep even though he's tired and that it takes him three

hours to fall asleep. (Tr. 775). Dr. Hausheer switched Plaintiff's medication from Abilify to Lurasidone 40 mg with an evening meal. (*Id.*). Dr. Hausheer opined Plaintiff's depression had improved a little but found he still has anhedonia and insomnia. (Tr. 778). However, Dr. Hausheer noted Plaintiff's voice has much more energy than it normally does, and he sounded much better. (*Id.*). Dr. Hausheer continued Venlafaxine XR 300 mg in the morning and increased Lurasidone to 80 mg. (*Id.*). Plaintiff had not been taking his Prazosin for the previous three weeks but was not waking up from nightmares. (*Id.*). As a result, Dr. Hausheer ordered Plaintiff to remain off the Prazosin and alcohol. (*Id.*).

On June 9, 2020, Plaintiff presented to Dr. Hausheer for a follow up appointment. (Tr. 769-771). Plaintiff reported having no nightmares despite discontinuing Prazosin. (Tr. 771). In addition, Plaintiff was more motivated and not feeling depressed at the time. (Tr. 769). Dr. Hausheer noted Plaintiff was not having any extrapyramidal side effects (EPS) from the Lurasidone, and that he is getting improvement in his depression. (Tr. 771). Dr. Hausheer continued Venlafaxine XR 300 mg in the morning and Lurasidone 80 mg. (Tr. 771).

**IV.    Discussion:**

In his appeal brief, Plaintiff raises the following issues for reversal: (1) whether the ALJ erred in failing to fully and fairly develop the record; (2) whether the ALJ erred at step two; (3) whether the ALJ properly considered Plaintiff's impairments in combination; and (4) whether substantial evidence supports the ALJ's RFC assessment. (ECF No. 14). After thoroughly reviewing the record, the undersigned finds that substantial evidence does not support the ALJ's RFC finding. Because this Court recommends remand, the undersigned will not address each of Plaintiff's allegations.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his RFC. *Vossen v. Astrue*, 612 F. 3d 1011, 1016 (8th Cir. 2010). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller v. Colvin*, 784 F.3d 472, 479 (8th Cir. 2015) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

Plaintiff argues that the ALJ's RFC determination fails to account for exertional and non-exertional limitations and fails to find Plaintiff's mental restrictions were disabling and below unskilled to a level that precludes all work activity. (ECF No. 14, pp. 9-11). Plaintiff contends that the ALJ's RFC is wholly inconsistent with the treating source medical record, and for example, completely overlooks and disregards evidence of expressed suicidal and homicidal ideation with respect to co-workers. Plaintiff primarily contends the ALJ erred in failing to discuss or consider Dr. Billingsley's PTSD questionnaire and evaluative findings in her RFC assessment. (ECF No. 14, p. 6). Dr. Billingsley's February 2020 compensation and pension (C&P) report is based upon his examination of Plaintiff in addition to his review of Plaintiff's VA records. (Tr. 782-787). Dr. Billingsley identified Plaintiff's primary mental health diagnosis of PTSD and opined Plaintiff suffered from a "total occupational and social impairment." (Tr. 783). Therein, Dr. Billingsley outlined his clinical findings and identified the criteria outlined in the Diagnostic and Statistical

Manual of Mental Disorders, 5th Edition (the "DSM-5") that he used to make his PTSD diagnosis. (Tr. 784-785).

The Commissioner argues the ALJ properly considered the evidence regarding Plaintiff's alleged PTSD and depression. (ECF No. 15, p. 6). Arguing that Dr. Billingsley's record did not "constitute a medical source opinion entitled to consideration," the Commissioner says the ALJ properly did not give it "special consideration." (ECF No. 15, pp. 8-9). The Commissioner avers Plaintiff's exams revealed minimal objective signs that contradicted Plaintiff's disabling symptoms or limitations and argues Plaintiff was not "isolated" because he attended "mental health group for combat veterans" twice per week and was able to attend his medical appointments "with no significant issues." (ECF No. 15, pp. 6-9)). The Commissioner says that while Plaintiff reported some symptoms of hypervigilance, his mental status exams were mostly normal and showed that he was pleasant with an appropriate mood and affect, good eye contact, normal speech, no behavior issues other than psychomotor retardation on occasion; no homicidal or suicidal ideations; normal thought content; logical, sequential, and goal-oriented associations; fair insight and judgment; normal orientation; no memory problems; no issues with attention and concentration; and an average fund of knowledge. (ECF No. 15, p. 6). The Commissioner contends Plaintiff was able to perform some daily activities, prepare meals, clean, and do laundry. (ECF No. 15, p. 6).

The evaluation of a mental impairment is often more complicated than the evaluation of a claimed physical impairment. *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996). Evidence of symptom-free-periods, which may negate the finding of a physical disability, do not compel a finding that disability based on a mental disorder has ceased. (*Id*.). Mental illness can be extremely difficult to predict, and remissions are often of "uncertain duration and marked by the impending

possibility of relapse." (*Id*.). Further, individuals suffering from mental disorders often have their lives structured to minimize stress and to help control their symptoms, indicating that they may be more impaired than their symptoms indicate. *See Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001); *see also Maestri v. Colvin*, No. 2:15-CV-2125-PKH-MEF, 2016 WL 4523890, *3 (W.D. Ark. Aug. 8, 2016), report and recommendation adopted, No. 2:15-CV-2125, 2016 WL 4523899 (W.D. Ark. Aug. 29, 2016). And, as in all disability cases, Plaintiff's ability to perform basis tasks does not equate to Plaintiff's "functional capacity to engage in substantial gainful activity." *Kelley v. Callahan,* 133 F.3d 583, 588-89 (8th Cir. 1998).

It is undisputed that as of July 15, 2019, the VA found Plaintiff to be 100% service-related disabled (Tr. 173), with the majority of Plaintiff's VA disability rating premised upon his combat-related PTSD diagnosis. With respect to the ALJ's consideration of the VA's disability finding, 20 C.F.R. § 404.1504 provides as follows:

> Other governmental agencies and nongovernmental entities—such as the Department of Veterans Affairs, the Department of Defense, the Department of Labor, the Office of Personnel Management, State agencies, and private insurers—make disability, blindness, employability, Medicaid, workers' compensation, and other benefits decisions for their own programs using their own rules. Because a decision by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, **it is not binding on us and is not our decision about whether you are disabled or blind under our rules.** Therefore, in claims filed (see § 404.614) on or after March 27, 2017, we will not provide any analysis in our determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits. **However, we will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that we receive as evidence in your claim in accordance with § 404.1513(a)(1) through (4).**

20 C.F.R. § 404.1504 (emphasis added). While the VA's determination as to Plaintiff's disability is not binding on the ALJ, the ALJ shoulder consider the VA's finding of disability and supporting

13

medical evidence. *See Charette v. Saul*, 2019 WL 7605835, at *9 (D. N.D. November 22, 2019), *citing Pelkey v. Barnhard,* 433 F.3d 575, 579-80) (8th Cir. 2008).

In *William D.*, the Court found the ALJ properly evaluated the consistency of a VA psychiatrist C&P examination for a claimant's VA disability rating when determining its persuasiveness in accordance with 20 C.F.R. § 404.1520c(c)(2). *See Willliam D. v. Saul*, 2020 WL 1047807, at *13 n.8 (E.D. Mo. Mar. 4, 2020). There, the ALJ addressed the VA's C&P exams as opposed to omitting them altogether from the decision. *Id.*, at *8. More recently, in *Lilly*, the ALJ found the VA C&P examiner an acceptable medical source and considered the statements from the VA psychologist in relation to the claimant's PTSD symptoms; however, the ALJ ultimately found the C&P examiner's statements unpersuasive when compared to the longitudinal record. *See Lilly v. Saul*, 2021 WL 1592670, at *11 (N.D. Iowa Feb. 23, 2021), report and recommendation adopted, 2021 WL 916928 (N.D. Iowa Mar. 10, 2021).

In her decision, the ALJ addressed other examining, treating, and non-examining physician opinions from the relevant period. (Tr. 10-22). This included discussion of a C&P examination from September 2017 performed by Dr. Terri Miller, Ph. D, which was *before* the relevant disability period, and concluded the results of Dr. Miller's examination reflected Plaintiff's difficulties were consistent with the current diagnoses for PTSD and major depressive disorder. (Tr. 17). Nevertheless, it appears that the ALJ altogether omitted Dr. Billingsley's 2020 exam findings from her consideration and decision. (Tr. 10-22). An ALJ is not required to explain all the evidence in the record, *see Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010); however, she cannot pick and choose only the evidence that buttresses her conclusion. *See Nelson v. Saul*, 413 F.Supp.3d 886, 916 (E.D. Mo. 2019).

14

The Commissioner argues the ALJ was not required to give any special consideration to Dr. Billingsley's assessment as it was conclusory. (ECF No. 15, p. 8). However, when a checkbox or conclusory medical source does not provide extensive explanations, the ALJ is required to view the medical source opinion in the context of Plaintiff's medical record. *See Despain v. Berryhill*, 926 F.3d 1024, 1028 (8th Cir. 2019) (citing *Cox v. Barnhart*, 345 F.3d 606, 609 (8th Cir. 2003)); *see also Phillips*, 2020 WL 3451519, at *3 (applying *Despain* to a medical source opinion evaluated according to § 404.1520c); *John B. H. v. Saul*, 2021 WL 1192930, at *26 (D. S.D. Mar. 30, 2021) (citing *Phillips*, 2020 WL 3451519, at *3). The record is unclear, but it does not appear to this Court that the ALJ engaged in such analysis.

The Court concludes the ALJ erred when she failed to consider Dr. Billingsley's opinion and failed to provide legally sufficient reasons supported by substantial evidence in the record for doing so. On remand, the ALJ must explain how she considered Dr. Billingsley's examination opinion, addressing whether it is well-supported and whether it is consistent with Plaintiff's medical record. *See* 20 C.F.R. § 404.1520c(b)(2). The ALJ is also requested to further develop the record regarding her credibility determination (Tr. 20) related to Plaintiff's testimony (16-17) as the Court finds it cursory and otherwise incomplete. *See Phillips v. Saul*, 2020 WL 3451519, at *4 (E.D. Ark. June 24, 2020). As the case is being remanded, the Court opines that a mental consultative examination is necessary to determine the restrictions imposed by Plaintiff's impairments. While Plaintiff's medical records document sporadic satisfaction with prescribed medications and temporary symptom relief, the same medical record evidences Plaintiff's impairments persisted with medication, and at times, even worsened, necessitating both medication changes and dosage adjustments. Furthermore, contrary to the Commissioner's assertions, the medical record as a whole contains ample evidence of Plaintiff manifesting suicidal

ideation, depression, psychomotor retardation, anhedonia, hypervigilance, dysthymic mood, anxiety, panic attacks, paranoia, social isolation, insomnia, and other worsening symptoms associated with Plaintiff's combat-related PTSD and depression. Finally, the ALJ should request an RFC assessment by a medical professional with respect to Plaintiff's functional limitations during the relevant period. Special attention should be paid to Plaintiff's ability to accept instructions and criticism from supervisors; sustain concentration; work with and around co-workers and supervisors; and work near moderate to loud noises and distractions. Plaintiff's ability to consistently work also should be evaluated since, during the ALJ's Hearing, the VE answered the ALJ's hypothetical about Plaintiff's frequent work absences and the availability of jobs as follows:

> Your honor, the employers that I speak with explain to me that once an employee has exhausted the normally accrued vacation and sick leave time, some employers tell me they will only accept one day per year. Other employers tell me they will accept two days per year. Based on [Plaintiff's report of absences], that would be 24 days per year; there would be no competitive employment available. (Tr. 71-72).

With such additional evidence, the ALJ should re-evaluate Plaintiff's RFC and specifically list in a hypothetical to a vocational expert any limitations that are indicated in the RFC assessments supported by the evidence.

V.  **Conclusion:**

Based upon the foregoing, it is recommended that the Commissioner's decision denying benefits be reversed and remanded for further consideration pursuant to sentence four of 42 U.S.C. § 405(g). **The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties**

**that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 4th day of January 2022.

            *Christy Comstock*
            CHRISTY COMSTOCK
            UNITED STATES MAGISTRATE JUDGE